at all. Argument is not to exceed 15 minutes for the appellant and 15 minutes to be shared by the appellees. Mr. Kalish, you may proceed for the appellant. It's Long A. Kalish. Good morning, Your Honors. My name is Jay Kalish and I represent the Appellant Prime Financial. I'd like to reserve three minutes for rebuttal, if I may. Your Honors, this is our appeal of the District Court's affirmation of the Bankruptcy Court's approval of a settlement between the Chapter 7 Bankruptcy Trustee and the IRS and KTULA, who is an individual. The Court should be aware of the fact that this case has a long and unusual history. The bankruptcy case in this matter was filed in 2009 and the history of the parties goes back well before that. The Court should be aware of the fact, also, that in 2009, the Chapter 11 was filed in Michigan as a means to block the action of the Kentucky Bankruptcy Court, who was attempting to seize all of Mr. KTULA's assets. And the reason for that is because he had been caught stealing about $850,000 out of a bankruptcy estate down in Kentucky. He filed the Chapter 11 as a means to collaterally block the action of the Kentucky Bankruptcy Court because he claimed that he had transferred all of his assets to the Michigan Corporation, which is TAJ, which is the debtor in the Michigan bankruptcy case. The case in Michigan dragged on for about 14 years through approximately 53 evidentiary hearings, thousands of pages of transcript, arguments, attorney changes on behalf of the debtor, and it's important to note that the Bankruptcy Court in Michigan took what I would characterize as the unusual step in a Chapter 11 to immediately appoint a Chapter 11 trustee instead of allowing Mr. KTULA to act as a debtor in possession. The reason for that is because a number of the issues that were raised by the Kentucky Bankruptcy Court that came to our court to attempt to get the case back led our judge to say that this is not a guy that they want driving the bus here. The essence of your argument, the Bankruptcy Court approved the settlement. It was impossible for all the parties to be satisfied with the approved settlement, but how did the, and particularly your client who would not wind up getting any money, but how did the bankruptcy judge abuse his discretion in approving the settlement when the Bankruptcy Court is of the view that the continued litigation would have been too expensive and would have depleted the bankruptcy estate, and the probability of your client being successful would have been, was really unreasonably low. What did the bankruptcy judge do that constituted an abuse of discretion in approving this settlement? Well, I think several things. First of all, the bankruptcy judge in this case was well aware of KTULA's background. We had an individual who was a known fraudster, a vexatious litigator, and who had been caught stealing in several bankruptcy courts. He was caught forging documents in the Michigan Bankruptcy Court, and for them to decide that the agreement, which was funded by the IRS and agreed to by the Chapter 7 trustee, satisfied the fair and equitable test that the Supreme Court had dictated for all of these settlements, it just didn't make any sense. And especially given the fact that my client had once offered $100,000 and then had offered $300,000, and they agreed to a $50,000 purchase price, it just didn't make any sense. And I believe that constitutes an abuse. Beyond that, I would indicate that the district court's order . . . I just want to confirm that your client's offer was conditioned on a clear title to the MOA, right? Yes, that's correct. But that wasn't a possibility, was it? Well, I think that's an interesting question. Okay, it would have been a possibility, but for the fact that TULA had threatened the Chapter 7 trustee with endless litigation. And so I don't think under these circumstances the Chapter 7 trustee wasn't in a position to guarantee title, which is the norm in bankruptcy sales. But you're right. The Chapter 7 trustee didn't and wouldn't do that because of the circumstances of this case. So what was the judge supposed to do? The judge was supposed to conduct an evidentiary hearing to actually determine who owned this asset. Because that's really what . . . the only issue here was the ownership of this MOU document. And after making the request on a number of different occasions to conduct an evidentiary hearing . . . As a matter of fact, we filed a motion asking for that before the trustee filed a sale motion. But the judge didn't want to do it. And I'm not sure why. You said earlier that there were 53 evidentiary hearings. So, you're saying now for this particular request for an evidentiary hearing, the bankruptcy judge made no explanation as to why he was denying an evidentiary hearing at this point in time? He did not. He just denied the motion. With just a form order, no explanation? No. And the motion was denied at the same time that the trustee's motion was granted. And the court record will show that the orders were entered at the same time. Okay, but there is a bankruptcy court opinion going through the various factors that led the bankruptcy court to approve this settlement that the trustee wanted to approve, right? Yes, there is. So, what's the abuse of discretion in the bankruptcy judge's findings on the decision to approve the settlement? I believe that the abuse is that under the circumstances of this case, and given the backgrounds of the people involved, that the bankruptcy court should have at least done an inquiry into what was going on here. Because in my view, the agreement between the Chapter 7 trustee and Mr. Katula funded by the IRS was completely... It was a pretext. And the only reason that the Chapter 7 trustee agreed to this was because the agreement put $50,000 in his pocket and allowed the court to end it. I'm sure at this point, after almost 15 years of extended action in this matter, I'm sure the court was tired of it. And I get it. Okay, but is your position then essentially that any time that a trustee argues for settlement, and the trustee is going to get some money, that they have some self-interest that would require an evidentiary hearing before a bankruptcy court could approve? That is not what I'm saying. In this particular case, the Chapter 7 trustee waited three and a half years before he told the court, I don't have any money. And these backroom negotiations were going on between Katula and his office, and the IRS just agreed to fund it. I'm not sure why. So after three and a half years of this, and there's no word of not having any funds, it would seem to me appropriate to find out why. And when you say the IRS agreed to fund it, what do you mean? Mr. Katula put up $50,000. He gave it to the trustee, and the IRS seized it, obviously, pursuant to their lien. And as part of this agreement, they agreed to release the lien to allow the trustee to keep it. It's an argument, one of the arguments in the case is that the IRS had a $500,000 claim without the settlement, in the absence of the settlement. Because you mentioned your client had made these offers, one for $100,000, and I forget the other amount. Were the potential IRS tax liabilities still in existence at the time your client made these offers? Yes. So really, if the IRS had an outstanding claim in excess of the amount of the offers being made in the absence of a settlement, I guess the settlement resolved and cleared up these conflicting claims for these different amounts. But the amounts being claimed were not all that impressive in view of the potential IRS liability. What would you say about that? Well, the IRS claim was for $1.2 million. And as Judge Tucker pointed out, it was only secured to the extent of the assets in the TAJ estate, and of course, it's questionable if there were any assets at all in the TAJ estate. But the amount of the offer was just for the MOU, and the MOU, the Memorandum of Understanding here, was actually a document that goes back well before the 2009 bankruptcy, and was really a potential profit sharing document between Prime Financial and Ctula. And the only thing that the estate arguably owned was a half interest in that. And for all of the years of the penancy of this case, Ctula had been arguing, in all the hearings and everything else, that it was an asset of TAJ, the debtor. And then all of a sudden, after 10 years, he changed his mind and he decided that it was his and not TAJ. I know you're out of time, but what would you like this Court to rule on this matter? I would like this Court to overrule the District Court and order the matter back to the U.S. Bankruptcy Court to examine the agreement, the settlement agreement, that was entered into between the debtor, the Chapter 7 trustee and the IRS and Ctula. Thank you. One second, judges. Good morning. May it please the Court, my name is Robert Bassel. I represent Robert Ctula, who was the successful buyer of the disputed assets in the Bankruptcy Court. As the Court is aware, there are three appellees. One is the bankruptcy trustee, the other is Ctula, the third is the primary secure creditor, the IRS. Counsel, because of the limited 15 minutes, we decided to have Ctula have 5 minutes and then 10 minutes for the primary secure creditor, the IRS. Judge, every case is different. In this particular case, all the appellees in the District Court believe that Judge Tucker, at the Bankruptcy Court level, did not abuse his discretion by authorizing the settlement. Judge Tucker focused on two matters. One, as Judge Clay had pointed out, there wasn't money in the estate. So, as to what Mr. Kalish is arguing, which is that, hey, you should have had an evidentiary hearing in the Bankruptcy Court level. The problem is, realistically, there is no money to do that. Mr. Kalish, in the oral argument in front of the Bankruptcy Court, very appropriately pointed out, this was very contentious litigation. Why wasn't there money in the sense that you've got Prime on the one side and you've got Ctula on the other and the IRS along with you? Why wasn't there money? All of them have money, don't they? In bankruptcy, there's a RES, a race. The race here was there are five disputed assets. Basically, the most important one, the whole reason why I'm here and Mr. Kalish is here is because our clients have money. They've been litigating since prior to a 2009 bankruptcy court case. In the bankruptcy court case, there are over 1,200 pleadings, which is not normal. It's a 2009 still open bankruptcy case, which is not normal. As Mr. Kalish pointed out, one evidentiary hearing took three and a half years and 54 sessions. All TAJ has is, we don't know. It's a black box. It's got a potential right to claims. There's a landfill in Kentucky. Both parties have been fighting over this since prior to 2009. Maybe there's some value there. Ctula thinks that he has an interest in it. Right now, Aaron Jay through another entity, he also owns Prime Financial, is running the landfill. This is why we're here today. IRS is here also because they had the most economic interest. It was their ox that was being gored because they were a secure creditor. They get paid off the top $436,000. There's no money in the estate. What the trustee is doing, he has an obligation to maximize the value of the estate. He went to the people who might have an interest in buying it. He went to Ctula. Ctula was a cash offer. He went to Prime. Prime was an offer with contingencies. Judge Tucker at the hearing said that those offers were off the table. In any event, they were contingent on warranting title. As Judge Tucker pointed out at oral argument, that's not the norm, where a bankruptcy trustee would warrant title. In any event, lawyers charged by the hour, were they charged on a contingency? A record was made before the bankruptcy court that there was no one there who would be able to litigate the case. You have a black box of some stuff that may have value. But Prime offered to litigate it. True. The problem there is the whole reason why we're here. There's a landfill in Kentucky that one Aaron Jade entity owns. Judge Tucker really did not want this concept of the bankruptcy being a state being represented by Aaron Jade against Aaron Jade. He also didn't want the concept of Ctula against Ctula because they're all litigating there. Judge Tucker looked at whether there were different options. Plus, I've been living this not as long as Mr. Kalish has. At the time of the oral argument, and this is in the record, I believe that Mr. Kalish had said that would be something we would consider. However, it was not actually something that they said they would do. But in any event, Judge Tucker, in his opinion, which was affirmed by the district court, which we believe that this court should affirm as well, said, no way. It's a conflict of interest. You can't have Jade on both sides. I believe that I'm out of time. Thank you very much. How much did the IRS get in this settlement? There's a waterfall in bankruptcy, as the court is aware. The waterfall in bankruptcy is that $50,000 comes in, the Chapter 7 administrative expenses get paid first, Chapter 11 administrative expenses get second. At the Chapter 7 level, I think it was $37,000 went to Chapter 7 trustee, Chapter 7 accountant, Chapter 7 trustee's counsel. At the Chapter 11 level, IRS had an administrative tax claim. They got paid 25 cents on the dollar. There's also a bankruptcy court lawyer for the Chapter 11 trustee who also got 25 cents on the dollar. So in any event, they were in the water, their ox got gored. There's no way that Prime Financial would have ever been involved. As part of this agreement, how much did Mr. Katula pay the IRS? I'm not sure if it's in the record. I know what's in the record is that there was a substantial amount of money. I believe it was referenced as a substantial amount of money was paid, but that's because he owed the money for different matters. I could tell the court if the court wants to know, but I don't think it's in the record. Other than it was referenced by Judge Tucker in oral argument and also by the trustee as a substantial amount, Mr. Johnson, who represents the IRS, I can't remember if there was a confidentiality agreement in the settlement as to the numbers. Obviously, if it's important for the decision-making process, it was a substantial amount, but Katula owes the IRS for different reasons as well. This was just something that I don't want to – it's Mr. Johnson's argument, but there's only so much that would come in. They were willing to put their money where their mouth was and to subordinate $436,000, their secure claim, so that this whole transaction could happen. Your opponent claimed that your client is a fraudster. Is there some court holding to that effect? Two things. One is if the court looks at page 6 of the opinion by Judge Tucker, Judge Tucker said, I know there are issues with Mr. Katula's credibility. That was something that Judge Tucker dealt with. The district court also, I believe, said something akin to this – it was just a cash transaction. It wasn't relevant. Mr. Appellant, in their Sixth Circuit brief, raised new issues regarding some matters in some Kentucky litigation, some matters in, I think, a Michigan court, and some other matters. None of those were in front of the bankruptcy court. This was a cash deal. Katula could be Attila DeHaan. He could be Mother Teresa. What the bankruptcy court is about is trying to maximize the value of assets for creditors, and it's two separate things. One is you sell it for as much money, and then Congress tells you where the money goes to. If people had an issue with the Chapter 7 trustee, they could have objected to his fee application, and if there really was this self-dealing, he would not have gotten paid. That didn't happen, but what happened was you sold the asset for as much as you could, and then there's a priority ladder as to who gets paid, and professionals – Mr. Kalish and I have been bankruptcy lawyers in southeastern Michigan for 30-some years. When we're representing an estate, we don't get paid unless there's court approval. We have to file a fee application. If there are issues with who gets the dough, someone can file an objection to their fees, and the court would deal with it. Judge Tucker has dealt with contested fee applications. He's been our bankruptcy judge since 2004. You've stressed this thing about that it would be parties actually litigating against themselves, but I don't really see it. If the judge had had a hearing and crime was litigating it, they'd be litigating it against Cotulla because he's the one who challenged the debtor's interest in the MOU. There are two pieces of litigation which Judge Tucker pointed out. One is standing, who has the right to the MOU. The other is, is there actually a right to these profits from the landfill? Perhaps on the first standing issue, Judge Tucker still thought it was a conflict, but there's less of a conflict. As to who actually owns the MOU, that one there's less of a conflict, but that doesn't get the trustee money. You still have to actually litigate. Let's say the court found in the debtor's favor. Once the court finds that, then you have what could be a very substantial asset. The notion that you would then say, hypothetically, there isn't a dispute about ownership. The idea that you're going to let Cotulla buy it for $50,000 when it could have some real value. Yes, but the problem is that second step could have some real value. That's been going on in Kentucky courts since prior to the 2009 bankruptcy. Even if there is standing where someone can assert, A, we got a right to some of these profits in this Kentucky litigation that's older than 2009, Mr. Jade's position is in the state court where there is no money, and therefore there's nothing that should be distributed under the profit sharing MOU. They've been litigating for good or for bad. All of us are lawyers here. We either charge hourly or we charge on a contingency. Bankruptcy judges have to deal with what's in front of them. Bankruptcy trustees do too. On the record, there was no one that Mark Shapiro, the bankruptcy trustee, was able to find to litigate this on a contingency. That probably makes sense because, as Mr. Kalish properly pointed out, one evidentiary hearing took three and a half years and 54 sessions. That was the only workable solution that the bankruptcy trustee thought. That was the only workable solution that the bankruptcy judge thought. There could have been an abandonment, and abandonment wouldn't have done anyone any good because those guys have a secure claim. Thank you. Matthew John Troy There's really only one thing I'd like to say today, and then I'm happy to address the court's questions, including some of the points that have been raised. But really what I want to say is that fundamentally the question on appeal is whether the bankruptcy court abused its discretion in approving the settlement. I don't think it did. I don't think that's the case, and I don't think Prime has shown an abuse of discretion. But what I want to say is on this record, I actually think this court could easily go further and state that not only did the bankruptcy court not abuse its discretion, it did the right thing. And I think that's clear because the only alternative to this transaction was abandonment of the assets, and that really wouldn't have gotten any money for the estate. So the estate had only disputed assets of unknown value that they really couldn't afford to monetize. And so they were kind of at the end of the road. The only person they could sell them to with a clouded title was Ctula. So they got what they could from Ctula, and I think that makes a lot of sense. So as far as the technical abuse of discretion analysis, this court has said the court should go through a four-factor test, look at the probability of success, the difficulties of collection, the complexity of the litigation, the interests of the parties, and the court did all of that. The court found that as to the litigation, success was uncertain. It was very unlikely they would net an amount greater than the $50,000. The value of the disputed assets was quite speculative. The litigation would be complex. It would be very expensive. It would be very time-consuming. And as far as the interest of the creditors, the IRS agreed to this transaction. The IRS was the secured creditor in the first position. We were the ones that mattered. As to Prime, because Prime was a general unsecured creditor at the absolute bottom of the waterfall that wasn't expected to receive any money, they were basically going to be unaffected by this transaction. Has the IRS been involved in this bankruptcy proceeding from the beginning? I think probably to some extent. I'm not exactly sure, but I think we filed a claim, and so we would have been around for some time. Can you explain why this has taken so long, the whole bankruptcy proceeding? No, but I can make an educated guess. I think that Aaron Jade, the party that controls Prime, and Mr. Katula and his entities are fighting a giant war, and this little case with Taj Graphics that may not have any assets is caught up in a much bigger feud. I'm astonished that an evidentiary hearing took three years and 53 sessions. What was the issue in that evidentiary hearing? Yes, it was whether Prime Financial's claim was good in the amount it submitted it or in some lesser amount. It was held to be some lesser amount, but still a very substantial amount, but generally unsecured. I also think that the culmination of that litigation also explains some other things. In the process of reaching that decision, the court held that this 2004 assignment of assets, the purported 2004 assignment of assets, was no good. That's one of the pools of disputed assets, but it held it was no good, and it said, look, this transaction wasn't done by a lawyer like you say. You kind of cooked this up. It's all a bit shady, and it really isn't an assignment of ownership. It's an assignment of a power of attorney, and the court gives a very strong hint in this case that the reasons underlying it saying the 2004 assignment of assets was invalid. One of its main reasons for that would also apply to the 2006 assignment of assets, which is what would have given this all-important MOU, Memorandum of Understanding, to Taj Graphics, to the bankruptcy estate. If that 2006 assignment was no good, they don't own that disputed asset. It never came into the estate. There's a strong suggestion, particularly if the court ruled the same way it did as to the 2004 assignment, that it doesn't belong to the estate. So I don't think Ctula's changed position is all that strange, given what the bankruptcy court held. The bankruptcy court has all but held that that second assignment is also not good. So I think, big picture, I'm not sure why the Chapter 11 was pending for 10 years, and I think we're at something like five years for the Chapter 7, which is a lot. I know COVID intervened. That may have slowed things down. But at the end of the day, there really isn't much here. So the question is, what's in the estate? And the answer is some disputed assets that probably aren't any good, and even if they are good, the estate doesn't have any money to prove that, and then it doesn't have any money to pay for the collection on top of it. And how much does the IRS get from this settlement? From the settlement at issue in this case, or a side deal that we made with Ctula? You can tell me both. Yes. So in this case, I'm not sure. Only $50,000 is coming into the estate, and I think we have an administrative claim in the Chapter 11. That could possibly be paid some amount. But beyond that, it's not clear. So the $50,000 comes in, and then it has to first go to Chapter 7 administrative fees and expenses. That's like U.S. trustee fees, the lawyer's fees, accountancy fees. When the trustee filed this final report a few months back, that was expected to be about $37,000. $12,000 would go to the next tranche. It would be shared with the Chapter 11 creditors. The administrative expense creditors, sorry. So there you're close to $50,000. You're already close to $50,000, and then the next tranche is like $50,000 total, and we'd be sharing slightly in that. But that's not including, that's not even getting to the secured claim of $436,000. So, you know. Was the IRS getting any? You started to tell me there was a separate. That's right. In order to agree to give up the levy and the lien on the $50,000, essentially to let go of the bird in the hand, Ctula had to cut a deal with us. We have judgments against Ctula and his wife for income taxes that aren't at issue in this case. We also had judgments for the trust fund recovery penalties that are at issue in this case. So I think, and I don't have an exact number for you, but it's somewhere north of $500,000 they agreed to pay us on these judgments. But that wasn't estate funds. That was not funds that were coming into this estate ever, and that's a completely separate matter. But that does explain why we were willing to do what we did, which is simply to let Ctula pay in $50,000. But, you know, to the extent my friend says the IRS is funding this, I think that's a misstatement. We haven't funded anything. But you've given up $400,000 or some large number of dollars' worth of claims that the IRS has. Not actually, no. Actually, we've only waived the secured claim as to the $50,000, but we also really haven't, you know, we don't think we've given up anything because the estate wasn't going to have anything. So the alternative here is the estate abandons, and I guess maybe we would have gotten the $52,000, and then we would be fighting Ctula to try to get the $500,000 he owes us elsewhere. So, you know, what we gained, I think, is some certainty about what Ctula and his wife are going to pay us that is not actually part of this bankruptcy. What is part of this bankruptcy is should the estate close and abandon these assets or should the estate sell its interest in these assets for $50,000? Now, I know that Prime is claiming, well, you know, they're worth a lot more than $50,000, but the bankruptcy court makes some pretty detailed findings. It says, well, no, your success in litigation is uncertain, right? It is not very likely that you'll net more than $50,000, and the value of these assets is quite speculative. It's going to be very complex litigation. It's going to be very expensive. It's going to be very time-consuming, and it's not in the interest of the creditor that really matters here, the IRS. So I think, you know, as far as the abuse of discretion analysis goes, I think the court addressed all the correct factors. It may not have used barred factor labels, but I think all the right things were considered. From what you're saying, it seems to me that although the IRS was in a preferred position, that none of this pertains to the settlement itself really doesn't pertain to the bankruptcy in the sense that you were better off because of it, but your claim wasn't better off because of it. That's right. The settlement between the IRS and Ctula doesn't pertain to the bankruptcy other than it allowed Ctula to pay $50,000 that it otherwise could have taken. The trustee Ctula settlement makes sense for the bankruptcy because they're maximizing the value of assets, which could be abandoned instead of getting $50,000. Or it could have been bumped up if the court allowed the litigation to determine who owned the MOU. But when you say allowed, I mean the trustee doesn't have to pursue speculative litigation that he doesn't have any money to pay for. So there's sort of this how would they allow it? Who's going to do it? It would have to be Prime. Yes, but Prime is owned by Aaron Jade, and he's the counterparty on the main asset, or essentially the counterparty. But you don't, I mean it made perfect sense to me to bifurcate those two issues. I mean one is who owns it, and the other is the value. But Your Honor, I think that thinking about who owns it, you can't get to who owns it without doing the litigation, which you can't afford to do. And you can't assign that litigation to Prime because Aaron Jade would be on both sides of that. But not on the ownership issue. Yes, on the ownership issue. That ownership issue is between Prime and Cattola, not Aaron Jade. But Aaron Jade may stand to benefit from the determination on that issue. Aaron Jade is not disinterested in the outcome of that, or possibly even just in delaying that. And in any event, the court found that it was all very speculative and very unlikely to net a higher dollar figure. And I think that's the thing. So even if you walk through that analysis, then you're still going to have to jump the hurdle of the IRS's secured claim before any of this makes sense. And we haven't even talked about the fact that the secured claim bore interest for 10 plus years. So the amounts are changing here, but the hurdle is substantial. So is this state court litigation going to go forward after this case is resolved? Or does this put an end to everything? Well, I don't know, and it's a good point. And I'd like to point out that that really has nothing to do with the bankruptcy. But it may go forward, and I kind of suspect that their war will continue. But this bankruptcy is for an estate with zero assets. So the $50,000 was in the best interest of the estate, and I see I'm out of time. Your time is up. Thank you. Thank you. Very, very briefly. Number one, the war is ongoing.  As soon as Skatula bought his way out of the bankruptcy court, it started up again in Kentucky, number one. Number two is that the only issue that really needed to be resolved was if the debtor had an interest in the MOU or if he didn't. And Prime Financial offered to litigate that at our expense, and that was rejected. And that's not Aaron Jade litigating against himself. That's the very simple ownership issue. And as I currently pointed out or I formally pointed out, Skatula had been jumping up and down for 10 years saying that it was an asset of the estate until it wasn't anymore. Finally, the district court actually pointed out that in order to approve the sale to Skatula, it had to find that Skatula was acting in good faith and it was an arm's length transaction. And under no circumstances could anybody ever have found that because but for the fact that the IRS decided to make this deal, the $50,000 wouldn't have been there anyway. And so aside from whatever side deal that they made, which I'm not privy to, I don't think there's any way that Mr. Skatula can demonstrate good faith or any sort of arm's length transaction here. And I'd be happy to answer any other questions. Thank you. Thank you. We have the arguments in hand. The case will be submitted and the clerk may call the last case.